## McCRAY v. CENTRAL TRUST CO. OF ILLINOIS et al.

Circuit Court of Appeals, Eighth Circuit.
October 1, 1928.

No. 7655.

R. E. Gish, of Tulsa, Okl. (J. F. Sharp, Jr., of Oklahoma City, Okl., on the brief), for appellant.

Conrad E. Cooper, of Tulsa, Okl. (George S. Ramsey, Edgar A. De Meules, and Villard Martin, all of Tulsa, Okl., on the brief), for appellees.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and OTIS, District Judges.

OTIS, District Judge. This is an appeal from a final decree confirming the report of a special master allowing the claim of W. S. McCray against the Southern Oil Corporation in receivership, but holding that claim to be junior and inferior to the claims of bondholders. Whether the McCray claim is entitled to the priority asserted by him is the sole question involved. His claim arose thus:

The Yale Natural Gas Company had obtained a judgment in the state court against the Southern Oil Corporation for the value of the gas sold to it by the gas company from which judgment the corporation appealed. McCray signed a supersedeas bond as surety. The gas in question had been sold to the corporation before the execution of the trust deed securing the bondholders. After the judgment was obtained a receiver was appointed, who took over all of the property of the corporation on behalf of the bondholders and general creditors. Thereafter the judgment was affirmed by the Supreme Court of Oklahoma. Subsequently the case went to the Supreme Court of the United States, which also affirmed the judgment, which judgment McCray, being liable as surety, has now paid, with interest and costs. The trust deed securing the bonds of the Southern Oil Corporation had been executed and recorded long prior to the rendition of the original judgment in the trial court.

In addition to these facts the special master found, the trial judge confirmed, and the record supports the following:

That at the time the said W. S. McCray signed the said supersedeas bond the Southern Oil Corporation was solvent, and had a large amount of crude oil and refined products on hand in Payne county, Oklahoma, which were in value far in excess of the amount of said judgment, and that the Southern Oil Corporation could have paid said judgment out of its current receipts, and it had ample other unincumbered funds and property out of which said judgment could have been paid, had the said corporation so desired. That at the time McCray signed said supersedeas bond the Southern Oil Corporation was doing a large volume of business, and that this condition of the corporation remained for a considerable time after said supersedeas bond had been signed by claimant.

That the claimant signed said supersedeas bond as an accommodation to the Southern Oil Corporation; that at that time he had confidence in said corporation and was willing to trust it, and did trust it and looked solely to the corporation for protection against any loss or damage that he might sustain by reason of signing said supersedeas bond, and not to the property of said corporation; that there was no agreement, contract, or understanding whereby the said W. S. McCray should have a lien on the property of the Southern Oil Corporation for indebtedness found due him, as aforesaid, and that said claimant has no lien upon any of the property of the Southern Oil Corporation.

As is noted above, the judgment was obtained and the supersedeas bond given before the receiver was appointed. The Supreme Court of Oklahoma affirmed the judgment after the receivership, and the appeal to the Supreme Court of the United States was tak-

en by the receiver under order of the District Court authorizing the appeal and providing that McCray should pay one-half the costs thereof. At no time did the receiver agree to protect McCray, nor was he ever ordered so to do by the court appointing him. It is reasonably clear that the appeal to the Supreme Court of the United States was taken as much in McCray's interest as in the interest of the creditors. Apparently the appeal could not have been taken in the interest of the bondholders, since in no event could anything covered by the trust deed which secured them have been taken from the receiver under any judgment in favor of the Yale Natural Gas Company for the value of the gas sold to the Southern Oil Corporation before the execution of the mortgage and long before the receivership.

1. Clearly McCray is entitled to no priority to the bondholders in the fund realized from the sale of the property covered by the deed of trust securing the bondholders, unless upon the rarely applied doctrine of equitable lien. He claims such a lien upon the authority of the decision of the United States Supreme Court in Union Trust Co. v. Morrison, 125 U. S. 591, 8 S. Ct. 1004, 31 L. Ed. 825. In that case a surety upon an appeal bond was allowed priority. But the equities there in favor of the claimant were far stronger than here.

In that case there had long been default on the principal and interest secured by a mortgage, and the trustees under the terms of the mortgage had the right to the possession and control of the railroad property there involved. Notwithstanding that right, they permitted the property to be operated by the mortgagor. In that situation, a judgment was obtained and execution thereunder threatened, which would have clearly hampered the operation of the road. An injunction was obtained against the enforcement of that judgment, and in connection with the injunction, and appeal from the decision of the trial court therein, the claimant, as surety, signed a supersedeas bond. He did not look, however, to the personal security of the mortgagor, but to the property of the road. Indeed, he took a chattel mortgage upon some of its personal property. The receiver appointed by the court under the court's direction specially obligated himself to protect the surety against loss on his bond. With these special equities in his favor, the Supreme Court affirmed the judgment of the Circuit Court giving the surety priority. The decision of the Supreme Court was made by reason, not of any one of the facts mentioned,

but in view of all of them together. That the vital facts there present are absent from the instant case is apparent.

In the Morrison Case, except for the supersedeas bond, the continued operation of the railroad involved there would have been seriously hampered. In the instant case the judgment, which was for $14,413.28 only, could readily have been paid out of the current funds of the corporation, apparently without any interference with its continued operation.

In the Morrison Case the receiver upon his application had been instructed by the trial court to protect the surety and reimburse him for any loss suffered by him out of the funds under the receiver's control. There was sufficient current income to have met this obligation. Notwithstanding that fact, and notwithstanding the court's direction, the current income was diverted to the benefit of the bondholders. In the instant case there was no such direction to the receiver by the court appointing him, and no understanding between him and the surety that the surety would be reimbursed for any loss suffered.

In the Morrison Case the surety looked to the property, and had a chattel mortgage on a part of the personal property, and at no time relied upon the personal credit of his principal. In the instant case the sole reliance of the surety was upon the personal credit of the corporation.

2. The doctrine of the Morrison Case, and for that matter of all federal cases allowing priorities under circumstances at all resembling those present here, has been confined to claims against railroads. The Supreme Court, referring to this doctrine, said, in Wood v. Guarantee Trust Co., 128 U. S. 416, 421, 9 S. Ct. 131, 132 (32 L. Ed. 472):

"The doctrine of Fosdick v. Schall [99 U. S. 235, 25 L. Ed. 339] has never yet been applied in any case except that of a railroad. The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

Referring to this same limitation, the Circuit Court for the Southern District of Illinois, in Farmers' Loan & Trust Co. v. Grape Creek Coal Co., 50 F. 481, 482, 16 L. R. A. 603, said:

"A railroad corporation is a quasi public institution, charged with the duty of operating its road as a public highway. If the

company becomes embarrassed and unable to perform that duty, the courts pending proceedings for the sale of the road will operate it by a receiver, and make the expense incident thereto a first lien. This is done on account of the peculiar character of the property. It is generally mortgaged to secure bonds, and persons who invest in such securities know that the mortgage rests upon property previously impressed with a public duty. Private corporations owe no duty to the public, and their continued operation is not a matter of public concern. It is only against railroad mortgages that the Supreme Court of the United States has sustained orders giving priority to receiver's certificates representing particular indebtedness, and, as already stated, then only on principles having no application to a mortgage executed by a private corporation owing no duty to the public."

In none of the cases to which we have been referred or which we have found has priority been given in a situation resembling the present one where the property involved was not railroad property. To extend the doctrine relied on here to other properties, and that when even as to railroad properties the doctrine has been restricted within ever-narrowing limits by the courts, certainly would not be warranted, where the facts present do not even bring the case within the doctrine applied in the railroad cases.

3. The case of United States Fidelity & Guaranty Co. v. United States & Mexican Trust Co. et al., 234 F. 238, L. R. A. 1916F, 1067, decided by this court, the opinion being written by Judge Sanborn, is conclusive against McCray's claim to priority. In that case a judgment had been obtained against the railroad company (whose property was later put in the hands of a receiver) on account of personal injuries caused by negligence of the servants of the company. The case was appealed and a surety bond given. Later the judgment was affirmed and the surety compelled to pay it. At the time the judgment was obtained the property of the railroad was already mortgaged and that mortgage was of record. It was a "flaming signal of danger that charged the Fidelity Company and all others dealing with the railway company with full knowledge of the terms and legal effect of the mortgage and of the bonds it secured." Nevertheless it was insisted by the claimant that its act had preserved the property to the bondholders, and that for that reason it was entitled to priority. To that the court said:

"But the fact that liabilities or guaranties incurred, money or materials furnished, or work done at the request of the mortgagor preserve the mortgaged property and enhance the security of the mortgagees, is no ground for displacing the prior lien of the mortgagees for the reason that the record of the mortgage is plenary notice that such acts will ordinarily and naturally have that effect, and will subject the enhanced value to the superior lien of the recorded mortgage."

Further the court said in that case, referring to Union Trust Co. v. Morrison:

"The opinion and decision in Union Trust Company v. Morrison, 125 U. S. 591, 8 S. Ct. 1004, 31 L. Ed. 825, when carefully read, fails, as was demonstrated by Judge Lurton, afterwards Mr. Justice Lurton of the Supreme Court, in Whiteley v. Central Trust Co., 76 F. 74, 77, 22 C. C. A. 67, 34 L. R. A. 303, to sustain the proposition that a surety who, at the request of the mortgagor, signs a supersedeas or other bond in reliance upon the solvency of the mortgagor, and in the belief and expectation that it will pay any loss the surety sustains out of its income or property, is entitled to any preference in equity over the bonds secured by the prior mortgage. It was not based upon that proposition but was founded on special equities which do not exist in this case, or in any ordinary case involving an alleged preferential equity of a surety upon a supersedeas bond."

Further in the same case the court said:

"There is no equity in the claim of this surety to be preferred in payment out of the mortgaged property to the holders of the bonds. The mortgage was made and recorded a decade before the surety signed its bond. That mortgage was made and recorded for the express purpose of giving to the bondholders secured thereby a first lien upon the mortgaged property and a preference in payment out of the income and out of the proceeds of the property mortgaged. Such a preference was secured by the express terms of the contract made between the mortgagor, the trustee and the bondholders. Probably some of the bonds had been repeatedly sold between the time when they were issued and the date when the supersedeas bond was given. The purchasers bought them in reliance upon the first lien upon the property of the railway company evidenced by the recorded mortgage. They had no notice or knowledge that the Fidelity Company was acquiring or seeking to acquire a lien superior to their own. The Fidelity Company gave them no notice of its attempt so to do, and no opportunity to protect or defend themselves against it until, if its preferential lien exists at all, it

has become perfect. On the other hand, the Fidelity Company, before and at the time it assumed its liability, had full knowledge by the record of the mortgage, first, that the bondholders had a first lien upon the mortgaged property; second, that the only parties that could waive that lien, or make a lawful contract to give another superior to it, were the trustee and the bondholders, and that the mortgagor was powerless to do so. Notwithstanding this knowledge the Fidelity Company neither sought nor secured any contract from the trustee or the bondholders. In the face of all this knowledge, it voluntarily signed the supersedeas bond and assumed its liability in reliance upon and at the risk of the ability of the mortgagor to protect and indemnify it, and it cannot now successfully appeal to a court of equity to throw that risk and the burden thereof upon the mortgage bondholders. Its equity is far inferior to theirs.

'"The contention that by means of the bond property was preserved, and the assets that came to the hands of the bondholders were increased by the amount of the judgment which the bond prevented the judgment creditor from collecting, is fallacious. The judgment was inferior in lien to the mortgage, and nothing which was subject to the mortgage could have been taken from the bondholders by a levy and sale under the judgment. If the execution would have been levied upon property upon which the bondholders had no lien, the taking of that property would not have diminished their security, and if it would have been levied upon property subject to their lien, their mortgage would have held that property. And even if it were true that the surety, by its bond to pay the judgment, preserved security or property which subsequently came to the bondholders, and which they otherwise would have lost, that fact would not give the surety a preferential equity over the bondholders. If it would, then every unsecured creditor, whose moneys, labor, material, or guaranty aided to preserve or enhance the value of the mortgaged property, might, by delaying collection of the mortgagor's debts, secure an equitable lien superior to that of the mortgage, and every creditor, whose claim, like that of Madison here, neither preserved nor enhanced the value of the mortgaged property, could give that claim a preferential lien by hiring some surety company for a small percentage of his claim to guarantee its payment. If the argument of counsel for the Fidelity Company could be sustained, its practical effect would be to strike down the security of every railroad mortgage, and to give to unsecured creditors liens superior to those of the creditors who by mortgage bonds, in reliance upon recorded mortgages, secure their payment. The law and equity, the written contract evidenced by the mortgage and its record, and the relative equities of the parties, cry out alike against the payment out of the income or the proceeds of the mortgaged property of the claim of a surety on a bond of a mortgagor in preference to the claims of bondholders secured by a prior mortgage. A mortgagor and his sureties cannot, by making a contract or bond with an unsecured creditor to pay the mortgagor's debt to him, transform his unsecured claim into a claim secured by a lien superior to that of bondholders secured by a prior recorded lien, and so are the authorities."

While there are some facts in the instant case that are stronger in the claimant's favor than those found in the case last referred to, the principles declared by this court in that case are clearly applicable here.

The decree below is affirmed.